IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
IN SEATTLE, WASHINGTON

OMARI TAHIR a.k.a., JAMES C. GARRETT,

Plaintiff,

v.

URBAN LEAGUE VILLAGE LLC, URBAN LEAGUE OF METROPOLITAN SEATTLE, URBAN LEAGUE VILLAGE CONDOMINIUM ASSOCIATION, URBAN LEAGUE VILLAGE APARTMENTS AT COLEMAN SCHOOL LP, HOMESTEAD LLP LLC, NATIONAL EQUITY FUND, NORTHWEST AFRICAN AMERICAN MUSEUM, Ronald English, James Kelly, Pamela L Banks, Carver Gayton, FEDERAL BUREAU OF INVESTIGATION, Mimi Gardner Gates, James Fearn, Ken Bounds, Andrew Lofton, Robert Flowers, Norm Rice, Bob Luciano, Charles Royer, Jim Diers, Steve Sheppard, STATE OF WASHINGTON, COUNTY OF KING, KING COUNTY SHERIFF'S OFFICE, CITY OF SEATTLE, SEATTLE POLICE DEPARTMENT SEATTLE PUBLIC SCHOOL DISTRICT, COAST PROPERTY MANAGEMENT JOHN DOES 1-100, JANE DOES 1-100

Defendants.

CASE No.: 2:21-cv-00536 MJP

CIVIL COMPLAINT VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES FROM RACKETEERING, CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY, AND RELATED CLAIMS; JURY DEMANDED
18 U.S.C 1961 et seq.; 18 U.S.C. 1964 (Civil RICO Remedies); and, International Covenant on Economic, Social and Cultural Rights; International Covenant on Civil and Political Rights (enacted by Congress with Specific Reservations) in pari materia with the Supremacy Clause in the "Original 1787" Constitution "For" The United States; and Articles 15, 17, 26 and 27 of the Universal Declaration of Human Rights under the Nuremberg Charter; and 42 U.S.C. §1981 and ch. 114, § 18, 16 aka 42 U.S.C. §§ 1981–82 and 18 U.S.C. §242 (Civil Rights Act of 1866); 14th Amendment to United States Constitution; and all precedents of Private Attorney General both thereunto pertaining or otherwise; and The March 3rd, 1865 ACT TO ESTABLISH A BUREAU FOR THE RELIEF OF FREEDMEN AND REFUGEES, as lawfully and permanently extended and expanded by Congress on January 25th, 1866 (a fact which only a supporters and beneficiaries of European White Judeo-Christian Supremacist supporters of extra-parliamentary terrorist assassin John Wilkes Booth would deny).

CIVIL ACTION

**CIVIL COMPLAINT FOR RELIEF**

## I. INTRODUCTION

COMES NOW Plaintiff and brings for this civil action for RICO remedies authorized by the federal statutes at 18. U.S.C 1961 *et seq.*; for declaratory and injunctive relief; for actual consequential and exemplary damages and for all other relief which is just and proper under all circumstances which have occasioned this initial COMPLAINT. See 18 §§ 1964(a) and (c) ("Civil RICO").

1.1 The primary cause of this action is a widespread criminal enterprise engaged in a pattern of racketeering activity within State lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the past twenty-three (23) calendar years.

1.2 The predicate acts alleged here cluster around criminal economic terrorism, antitrust, Intellectual Property infringement, political payoffs, obstruction of justice, obstruction of criminal investigations, manipulation of State and local law enforcement by fraud and other means, peonage and slavery. See 18 U.S.C. §§ 2318, 2320, 1512, 1513, 2315, 1503, 1510, 1511 and 1581-1588 respectively.

1.3 Other RICO predicate acts were part of the overall conspiracy and pattern of racketeering activity alleged herein, *e.g.* mail fraud and bank fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

1.4 The primary objective of the WEED AND SEED / GENTRIFICATION / ETHNIC CLEASNING racketeering enterprise has been to inflict severe sustained economic hardship upon Plaintiff and an entire class of African allegedly "Freedmen" who are refugees in the United States, as well as with the intent of impairing, obstructing preventing and discouraging Plaintiff from contracting, writing, publishing, investigating and conducting judicial and economic activism as a qualified Private Attorney General for exposing and opposing cultural, economic and political suppression and oppression of protected classes of African Americans and Americans with Disabilities which Plaintiff is a member of, including, but not limited to, the systematic violation of the human rights of African American persons to own property in association with one another for their own economic, educational, cultural and scientific advancement as per Articles 15, 17, 26 and 27 of the Universal Declaration of Human Rights under the Nuremberg Charter.

## II. JURISDICTION

2.1.    This Federal District Court has original jurisdiction pursuant to the civil RICO remedies at 18. U.S.C. 1964, and the holdings of the U.S. Supreme Court in Tafflin v. Levitt, 493 U.S. 455 (1990), and the U.S. Court of Appeals for the Ninth Circuit in Lou v. Belzberg, 834 F.2d 730, hn. 4 (9th Cir. 1987).

## III. PARTIES

3.1 **Plaintiff**: OMARI TAHIR-GARRETT  is a single man residing primarily in the State of Washington, in KING County within the Western District of Washinton. Plaintiff is Co-Chair of the *Black Alliance For Education* (1970 to present), Co-Founder and Registered Agent of the *African American Heritage Museum & Cultural*

*Center,* which has been the sole exclusive rightful owner of the property at 2300 S. Massachusetts Street, Seattle Washington, 98144, since January 16th of 1998 (EXHIBIT 1).

3.2 **Defendant**: Urban League Village LLC, a Washington Limited Liability Company (UBI Number 602 279 973), formed on March 18, 2003.

3.3 **Defendant**: Urban League of Metropolitan Seattle, a Washington Corporation (UBI Number 601 139 049), formed August 4th, 1936, which is alleged by Urban League Village LLC to be the sole governing entity of Urban League Village LLC.

3.4 **Defendant**: Urban League Village Condominium Association, a Washington Corporation (UBI Number 602 747 041) which alleges itself to have been formed under the Washington Non-profit Corporation Act on July 23, 2007.

3.5 **Defendant**: Urban League Village Apartments at Coleman School LP, A Washington Limited Partnership (UBI Number 602 623 586), formed June 16th, 2006, which alleges itself to be governed by "Urban League Village LLC", "National Equity Fund" and "Homestead LLP LLC".

3.6 **Defendant**: Pamela L Banks, an individual upon information and belief residing in Washington State, both in her individual capacity and in her professional capacity as Registered Agent of "Urban League Village Apartments at Coleman School LP".

3.7 **Defendant**: Homestead LLP LLC, a "Foreign Limited Liability Company" which alleges its principal office street address to be "10 S. RIVERSIDE PLAZA, SUITE 1700, CHICAGO, IL, 60606, UNITED STATES".

3.8 **Defendant**: Northwest African American Museum (UBI Number 602 618 077), a Washington Corporation formed May 31, 2001.

CIVIL ACTION

3.9 **Defendant**: Mimi Gardner Gates, a resident of Seattle, Washington, who is married to Bill Gates Senior, the father of Bill Gates who is Co-Chairman of the Bill & Melinda Gates Foundation, in her individual capacity and also in her professional capacities as both a member of the Gates Family, former board member of the Seattle Art Museum and as a CURRENT board member and governor of "Northwest African American Museum".

3.10 **Defendant**: Ronald English, upon belief resides in King County within the Western District of Washington State, and, upon information and belief was at the time of many of the injuries complained of in this complaint the GENERAL COUNSEL of the SEATTLE PUBLIC SCHOOL DISTRICT, acting in abuse of his power and authority, out of personal and professional animus towards Plaintiff, towards progressive organizations founded in part by Plaintiff, and towards protected classes of African Americans and Americans With Disabilities of which Plaintiff is a part, and a desire to silence them and their activism. Defendant English has a many year history of such abuses of power under color of authority, including willfully lying about the late Seattle Public Schools Superintendent John Stanford in the aftermath of Stanford's untimely and unfortunate death.

3.11 **Defendant**: Carver Gayton, a resident of King County, Washington, is Plaintiff's former history teacher and football coach (EXHIBIT 2) , a J. Edgar Hoover FBI Agent (allegedly retired), and former and founding Executive Director of the "Northwest African American Museum", who, while acting in that capacity, fraudulently collected at least $400,000 from the RICO scheme, and is a Defendant in this case in both his personal and professional capacities.

3.12 **Defendant**: State of Washington, a Federal Corporational Partisan-Political Campaign Coterie state in accordance with Title 5, U.S.C.S. § 1501(2), and subsidiary of B United States pursuant to Title 28, U.S.C.S. § 3002(15); and member of the Federal and Conterminous/coterie states governments' [5 U.S.C.S. § 1501(2)] 14th Amendment person C.U.S.A..

3.13 **Defendant:** COUNTY OF KING, a Partisan-Political Corporational Subdivision of the State of Respondents Federal State of Washington [5 U.S.C.S. § 1501(2)] 14th Amendment person.

3.14 **Defendant:** CITY OF SEATTLE, a Partisan-Political Corporational Subdivision of the State of Respondents Federal State of Washington [5 U.S.C.S. § 1501(2)] 14th Amendment person.

3.15 **Defendant:** SEATTLE PUBLIC SCHOOL DISTRICT is a government entity in the City of Seattle, KING COUNTY, governed and functioning under the laws of the State of Washington.

3.16 **Defendant:** James Fearn, individually and in his official capacity as Attorney for the Seattle Housing Authority and former Federal HUD Attorney, upon belief resides in KING County within the Western District of Washington State and, upon information and belief is and was at the time of many of the injuries complained of in this complaint, acting outside the course and scope of his duties, in abuse of his power and authority and out of personal and professional animus towards Plaintiff and protected classes of which Plaintiff is a member, and acted in a blatantly and obviously illegal, unfair, and dishonest manner by fraudulently claiming to be African

American Heritage Museum & Cultural Center's representative in court, which he was not, without any supporting documentation.

3.17 **Defendant**: Ken Bounds, individually and in his official capacity as Seattle Parks Department Superintendent and as treasurer of the fraudulent "Northwest African American Museum", upon belief resides in King County within Western District of Washington State.

3.18 **Defendant**: Andrew Lofton, individually and in his official capacity as Director of the Seattle Housing Authority during the time that many of the injuries complained of in this complaint were sustained, acting both within and outside of the course and scope of his duties, in abuse of his power and authority and out of personal and professional animus towards Plaintiff and protected classes of which Plaintiff is a member, and acting in a blatantly and obviously unconstitutional and unfair manner to literally silence them and their activism.

3.19 **Defendant**: Robert Flowers, a resident of Seattle, Washington, Former President of African American Heritage Museum & Cultural Center and simultaneously Board Member of the Urban League, who willfully sabotaged the former by violating his fiduciary duties towards it on behalf of the latter.

3.20 **Defendant**: Norm Rice, upon information and belief still a resident of King County, Washington, a Defendant both in his individual capacity and professional capacity as the former mayor of Seattle

3.21 **Defendant**: Bob Luciano, upon information and belief still a resident of King County, Washington.

3.22 **Defendant**: Charles Royer, both as an individual and in his professional capacity as the former mayor of Seattle.

3.23 **Defendant**: Jim Diers, both as an individual and in his professional capacity as an official of the Defendant City of Seattle's Department of neighborhoods.

3.24. **Defendant:** Steve Sheppard, both as an individual and in his professional capacity as an official Defendant City of Seattle's Department of neighborhoods.

3.25 **Defendant**: James Kelly, both as an individual and in his professional capacity as as an officer and signatory of Urban League of Metropolitan Seattle and Urban League Village LLC.

3.26 **Defendant**: NATIONAL EQUITY FUND, a murky and mysterious corporate entity that is a governor of Defendant Urban League Apartments At Coleman School LP.

3.27 **Defendant**: Federal Bureau of Investigation (FBI), an involved and complicit law enforcement agency.

3.28 **Defendant**: King County Sheriff's Office, an involved and complicit law enforcement agency.

3.29 **Defendant**: Seattle Police Department, an involved and complicity law enforcement agency.

3.30 **Defendant**: COAST PROPERTY MANAGEMENT, a property management company doing business in the state of Washington, responsible—along with other Defendants—for two deaths and one near death injury at 2300 S. Massachusetts Street on February 9th, 2021.

3.31 **Defendants**: John and Jane Does 1 through 100, respectively, are yet to be identified entities involved and complicity in these patterns of racketeering activity and/or conspiracy to engage in the same.

## IV. BACKGROUND

4.1 Plaintiff Omari Tahir-Garrett, is an African, born in the colonized lands of Native Americans wrongfully called American "Indians" because of European colonizer invaders mistakenly believing they had reached India. Plaintiff is entitled to "equal protection of the law" under the 14th Amendment Treaty between so-called "Freed African Slaves" and the European colonial settler concocted United States Constitution (which non-consensually forced "constitutional citizenship" upon Black folks without any plebiscite).

4.2. Plaintiff Tahir-Garrett has repeatedly and intentionally been unlawfully denied "equal protection of the law", such denial being consistent with U.S. Supreme Court rulings in the Dred Scott and Plessy vs. Ferguson Rulings that "a Black man (African) has no rights a white man is bound to respect", also coupled with decisions to fail/refuse to pay Reparations to repair the both psychological and economic damage resulting from hundreds of years of European Colonial Settler "Judeo-Christian" white supremacist terrorism enshrined in the U.S. Constitution underscored by that Constitution's "three fifths of all other persons" designation for Plaintiff's ancestors, which today has resulted in both Plaintiff and today's so-called protected class of African Americans having one tenth or less of the per-capita

financial and/or land base of the "Indian"-killing European Colonial Settler occupiers of Native American lands in North, South and Central America and South Africa (where Plaintiff denotes they are being challenged by the EFF).

4.3. On the 23rd day of November, 1985, Plaintiff Omari Tahir-Garrett, and five other members of a protected class of which Plaintiff is a member, founded the African American Heritage Museum & Cultural Center, and began a course of civil initiative by which to negotiate the purchase, from Defendant SEATTLE PUBLIC SCHOOL DISTRICT, of the building and property at 2300 S. Massachusetts Street, Seattle, WA 98144. This course of civil initiative is and already was a well established precedent, by which the property that is now El Centro De La Raza was previously purchased from that same Defendant, and by which the property that is now Daybreak Start Cultural Center was purchased from the United States Army.

4.4 In 1994, Defendant City of Seattle issued an official public report in which it agreed with Plaintiff that the property should come under the ownership of Plaintiff's organization (the AAHM&CC), to be developed by and for the purposes publicly proposed by Plaintiff and that organization, and promised to allocate significant block grant revenue towards this effort (as listed in the Mayor's final report, EXHIBIT 3).

4.5 On January 16th of 1998, the African American Heritage Museum & Cultural Center (AAHM&CC) successfully purchased that property and building from the above named defendant. The AAHM&CC has thereafter always been the sole and exclusive rightful owner of this property (EXHIBIT 1). The signatory for the seller was Superintendent John Stanford, who shortly thereafter passed away, and the

signatory for the buyer (AAHM&CC) was Robert Flowers, who thereafter attempted to destroy the AAHM&CC on behalf of the Urban League's racketeering enterprise.

4.6 Shortly after the death of John Stanford, defendants began engaging in their pattern of racketeering activity and their conspiracy to commit the same. Defendant Ronald English took the initial lead in this racketeering activity by willfully lying, denying the fact that John Stanford had signed the sale of the property to Plaintiff's organization (the AAHM&CC), when Ronald English knew full well that John Stanford had in fact done so. The objective of this lie was to fraudulently and illegally transfer physical possession of the AAHM&CC's recently purchased building to the "URBAN LEAGUE" series of defendants, and funnel HUD money through the building into the hands of the racketeers, and also to usurp at least $2 million (to be further assessed via research and discovery) of the block grant money that had been promised to the AAHM&CC, using said money to create residential condominiums for the benefit of the racketeers instead of a museum and cultural center for the benefit of the protected class of African Americans of which Plaintiff is a part. (The racketeers did this in spite of the fact that the $1 million in consulting fees expended in 1994 had resulted in the Mayor's Final Report --EXHIBIT, which agreed with the project proposed by Plaintiff.)

4.7 On June 4th, 1998, Defendants, acting in collusion, used illegal force and violence to physically displace Plaintiff and Plaintiff's organization (the AAHM&CC) from AAHM&CC's own property, in violation of Article 17 of the Universal Declaration of Human Rights, which states that oppressed minorities within any signatory nation may not be denied their right to own property, either as

individuals or in association with one another. The decision by Defendants KING COUNTY, State of Washington, and City of Seattle to behave has though Plaintiff's and AAHM&CC's ownership claim to the land did not exist is inconsistent with their own internal real estate purchase and foreclosure laws as written, and is also inconsistent with their treatment of similar organizations of other ethnic groups within this city, county and state, who have used similar and/or identical means and strategies to successfully claim ownership of land therein for the same cultural development purposes pursued by Plaintiff and the AAHM&CC.

4.8 Defendants then, having succeeded in physically assaulting and robbing Plaintiff, his organization and his protected class of their land, infrastructure, exhibits, educational equipment, sports equipment, musical equipment, other professional effects and personal freedom, then proceeded to illegally utilize the property for precisely the racketeering activities they had intended. They continue to do so to this very day.

4.9 Eventually, the Mayor's office of Defendant CITY OF SEATTLE noticed the fact that Urban League of Metropolitan Seattle's receptionist, Barbara Garrett, was Omari Tahir-Garrett's niece, whose job duties included logging in donations and answering phone calls from the Mayor's office while Defendants were in the midst of acquiring and controlling their RICO racketeering enterprise. The Urban League summarily proceeded to unfairly fire Barbara Garrett, simply because she is the niece of Plaintiff Omari Tahir-Garrett.

4.10 Due to Defendants' illegal racketeering, Seattle's African American community has been denied an operational cultural center of comparable quality and

capacity to what other ethnic groups in the City are not only allowed but encouraged to build, utilize and enjoy. The lack of such a facility has caused much loss of life, limb, health, economic opportunity and welfare. A recent example of this loss in the two deaths and one other near-death injury that occurred in the parking lot of 2300 S. Massachusetts Street on February 9th, 2021, when Defendant Coast Property Management murdered an innocent young woman by the hand of its employee who was then himself killed by Defendant Seattle Police Department.

4.11. In spite of Defendants' illegal racketeering, Plaintiff, his organization (AAHM&CC) and his protected class have, of course, consistently returned to the property and consistently, whenever and to whatever extent physically possible, continue to use if for the public purpose which they, as the rightful owners, have every right to use it for (an African American Heritage Museum and Cultural Cener), and which Defendant City of Seattle publicly agreed with them to be the officially designated use of the property from February of 1994 onward. Plaintiff, Plaintiff's organization and plaintiff's protective class have consistently continued to assert their true and rightful ownership of the building over the past 23 years, and will continue to do so for as long as is necessary for justice to be served and repairations to be paid, even if that takes another 300 years.

4.12 Plaintiff, plaintiff's organization and plaintiff's protected class have, naturally, been using the eastern courtyard of their own building for its authentically designated purpose since June 19th, 2020, in spite of the ongoing presence of the racketeering operation inside the building. Although the racketeering operation continues to be illegal, Plaintiff's and plaintiff's organization's / protected class's

legitimate operation in their own eastern courtyard has not to date physically prevented the ingress and/or egress of the racketeers to and from this building in any way. Statements by the racketeer Defendants alleging that it has are simply untrue and are part of the racketeering operation's false propaganda campaign to continue slandering, demonizing, marginalizing, isolating and displacing the true owners of the building, who are Plaintiff, plaintiff's organization and plaintiff's protected class.

4.13 On March 30, 2021, Defendant "URBAN LEAGUE VILLAGE LLC" filed a fraudulent lawsuit in a court of Defendant KING COUNTY (No 21-2-04082-5 SEA), falsely claiming to be the owner of the property, which in fact has been exlusively owned by Plaintiff's organization, the AAHM&CC, since January 16, 1998. This lawsuit goes on to allege many other claims which are false, most of them willfully so, as Plaintiff will demonstrate to any genuinely interested party, including this court if it is such. The purpose of Defendant URBAN LEAGUE VILLAGE LLC's false lawsuit is to continue and perpetuate the racketeering activity by creating a pretext under which the other Defendants might again collude to illegally assault Plaintiff and his protected class by force and violence to remove us from our own property yet again. URBAN LEAGUE VILLAGE LLC's lawsuit is self contradictory at face value because on the one hand it goes to great length in attempting to deny that Plaintiff Omari Tahir-Garrett is a tenant at 2300 S. Massachousetts Street (which, in fact, he is), while, at the same time, the lawsuit attempts place URBAN LEAGUE VILLAGE LLC in the position to act towards Omari Tahir-Garrett as an evicting landlord, (which URBAN LEAGEU VILLAGE LLC is not).

4.14  The actual facts of Plaintiff Omari Tahir Garrett's current tenancy at 2300 S. Massachusetts street are that he IS a tenant, NOT of the racketeering organization "URBAN LEAGUE VILLAGE LLC" but of the property's true authentic owner and landlord the AFRICAN AMERICAN HERITAGE MUSEUM & CULTURAL CENTER, an organization of which he is also a co-founder, board member and registered agent in addition to being its tenant. He has been in this tenancy arrangement since June 19, 2020, and the arrangement is that he stays on the property every day and every night providing round the clock security for the property owner (AAHM&CC). The fact also is that Plaintiff Omari Tahir is otherwise homeless at present but for this security job he is working for the organization of which he is co-founder, as Omari Tahir has been homeless since being evicted by another landlord connected to the Gates family in March of 2017 (in a uniquely and unconstitutionally precedent setting anti-tenant eviction case overseen by a radically anti-tenant activist Judge, which URBAN LEAGUE VILLAGE LLC gloatingly quotes and cites with their typical Anti-Black and anti-poor people zeal, even though those landlords eventually had to offer Plaintiff a settlement for having violently physically injured him in the course of that eviction). Nor does Plaintiff, who is a pauper, receive any compensation for the round-the-clock security he is providing other than the land and space itself in which to physically exist while he is providing this security, nor are Plaintiff's organization/landlord or his protected class in a position to offer Plaintiff any other compensation than the ability to exist within that physical space itself, due to their absolute impoverishment at the hands of Defendants via Defendants' ongoing RICO racketeering chain of abuses, usurpations and lies. Among URBAN LEAGUE

VILLAGE LLC's lawsuit's many lies is the false claim that Plaintiff Omari Tahir-Garrett owns a motorhome that is parked on the curb of a nearby street. Plaintiff Omari-Tahir Garrett does not and never has owned that motorhome, nor does he have any idea whom its owner is. Defendants, of course, are uniquely positioned to look up the identity of its owner if they wished to, since Defendants own and control the DMV. Defendants, however, appear not to care about accuracy, as they are merely seeking to manufacture a pretext—however flimsy—by which to justify violent state action against Plaintiff and Plaintiff's protected class. Thus, even though the only apparent commonality between plaintiff and whomever owns that motorhome is that the owner is probably (like plaintiff) not personally very wealthy, while Defendants are all so very wealthy that, to them, serving an eviction suit upon any poor person is sufficient in their minds to have served it upon ALL the poor, (hence their willingness to harass some random motorhome occupant who happened to park nearby in the name of evicting me from a property they don't even own).

4.15 On April 1st, 2021, only two days after filing their lawsuit against me, the URBAN LEAGE VILLAGE LLC submitted a report to Defendant State of Washington, signed under penalty of perjury and stating unequivocally that URBAN LEAGE VILLAGE LLC does NOT own any land or buildings in the state of Washington. (EXHIBIT 4).

## V. STATEMENT OF FACTS

5.1 Plaintiff Omari Tahir-Garrett brings forth a cause of action against the defendants, each of them, for violation of the Civil RICO Statute, International Covenant on Economic, Social and Cultural Rights; International Covenant on Civil and Political Rights, Sherman

Antitrust Act, Clayton Antitrust Act, Federal Trade Commission Act, Civil Rights Act; International Covenant on Human Rights; International Covenant on Rights of Indigenous People; and Discrimination Against Federal Financial Assistance Programs (Title 42, U.S.C.S. § 2000d).

5.2 The defendants State of Washington, City of Seattle and King County, collectively (hereinafter referred to as "government defendants"), are municipal political-partisan corporations codified in Title 5 U.S.

5.3 The defendants strategically place state, city and county operatives into "nonprofit" positions as directors and deputy directors of African-American non profit organizations to carry out clandestine operations of gentrification forcing Blacks out of our political economical and cultural base, to dilute the Black community's voting strength and destroy its economic base. More importantly, the State, City and County defendants used federal financial assistance for political payoffs awarding federal financial grants and loans to defendants Rice, Flowers, Fearn, Bounds and Lofton once they were strategically placed as directors and employees of nominally Black nonprofit organizations.

5.4 The government defendants, in concert with defendants Rice, Fearn, Lofton, Flowers, Ron English, Seattle School District, Urban League of Metropolitan Seattle, co-conpirators Bob Luciano, Chandler and Kelly and others collectively, by and through racketeering organized crime, influence and corruption used federal financial block grants as a form of economic terrorism to financially stifle any and all African-American political, social, cultural and economic progress, by and through use of federal financial assistance, in blatant violation of Title 42, U.S.C. § 200d-7. This form of Economic Apartheid and Neo-Colonialism operates to keep the colonized Blacks subjugated through economic, cultural, religious, and social

1   deprivation, i.e. crime prone / disadvantaged. Mayor and former Weed & Seed DOJ Director

2   Jenny Durkan has now publicly admitted that this was done intentionally and systematically.

3       5.5. Further example, if warranted, United States Department of Justice Weed & Seed

4   Grants, in pertinent part describes itself thusly: "Weed and Seed is a community-based strategy

5   that aims to prevent, control, and reduce violent crime, drug abuse, and gang activity in targeted

6   high-crime neighborhoods across the country. The goal of the strategy is to "weed out" violent

7   crime, drug use, and gang activity from selected neighborhoods and then to help prevent crime

8   from reoccurring by "seeding" those sites with a wide range of public and private efforts to

9   empower and develop them."

10      5.6. However, to the contrary, the defendant's use this federal financial program for

11  ethnic cleansing ("gentrification") against the Black community to stifle Black political activism,

12  Black economics and Black culture by and through arresting and incarcerating Black voices who

13  oppose the status quo agenda and the plans to dilute the Black voting strength. Moreover, the

14  defenants, each of them, use law enforcement to arrest Plaintiff for his political activism simply

15  for grieving governments and opposing Defendants' political agenda of displacing Black people

16  in violation of the above mentioned domestic and International conventions.

17      5.7 Further, the 99.5% of all federal financial block grants go to white owned profit and

18  nonprofit organizations, which, the majority of them, recycle the non government defendants

19  into these in political payoff positions of employment to divert federal funding away from Black

20  social, economic, cultural and political interests in favor of slave drivers. Further examples

21  include whites obtaining property ownership through assisted federal grants and loan programs

22  within the Black community and, moreover, obtaining federal grants and loans to rehab the

23  properties and, thereafter, quietly selling the properties to other whites without ever listing the

property for sale with Black owned media or posting "for sale" sign on the property itself. See

e.g. King County: "Whitest Big County in the United State", published by Seattle Times, July 3-

6, 2016. Also see Urban League Wath (http://urbanleaguewatch.blogspot.com/).

## VI. COUNT ONE

### Conduct and Participation in a RICO Enterprise

### Through a Pattern of Racketeering Activity:

### 18 U.S.C. §§ 1961(5), 1962(c)

6.1. Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference.

6.2. At various times and places partially enumerated in Plaintiff's documentary material, all Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

6.3 Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9) and 1962(c).

6.4. During the twenty-three (23) calendar years succeeding January 16, 1998 A.D., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

6.5 Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, a continuing threat of their respective racketeering activities, also in violation of RICO law at 18 U.S.C. 1962(c) *supra*.

1    6.6. Pursuant to 84 Stat. 947, Sec 904, Oct. 15, 1970, the RICO laws itemized above are

2    to be *liberally* construed by this honorable Court.

3    ### VII. COUNT TWO

4    **Conspiracy to Engage in a Pattern of Racketeering Activity:**

5    **18 U.S.C. §§ 1961(5), 1962(d)**

6    7.1. Plaintiff now re-alleges each and every allegation as set forth above, and hereby

7    incorporates same by reference.

8    7.2 At various times and places partially enumerated in Plaintiff's documentary material,

9    all Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a

10   pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d). At various times

11   and places partially enumerated in Plaintiff's documentary material, all Defendants did also

12   conspire to conduct and participate in said RICO enterprise through a pattern of racketeering

13   activity, in violation of U.S.C §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

14   

15   7.3. During the twenty-three (23) calendar year succeeding January 16, 1998 A.D., all

16   Defendants did cooperate jointly and severally in the commission of two (2) or more of the

17   predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C.

18   1962(d).

19   7.4. Plaintiff further alleges that all Defendants did commit two (2) or more of the

20   offenses itemized above in a manner which they calculated and premeditated intentionally to

21   threaten continuity, a continuing threat of their respective racketeering activities, also in violation

22   of U.S.C. 1962(d) (Prohibited activities *supra*).

23   7.5 Pursuant to 84 Stat. 947, Sec. 904, Oct 15, 1970, the RICO laws itemized above are to

24   be *liberally* construed by this honorable Court.

## VIII. RELIEF REQUESTED

8.1. Wherefore, pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiff requests judgement against all named Defendants as follows:

## IX. COUNT ONE

9.1 That this Court find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

9.2. That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise o persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

9.3. That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE *supra*.

9.4. That all Defendants be required to account for all gains, profits and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violations of applicable state, federal and international laws.

CIVIL ACTION

9.5. That judgement be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b).

9.6. That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b).

9.7. That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b).

9.8. That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $160.00 per hour worked (Plaintiff's standard professional rate at the start of this action).

9.9. That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violations of appilicable state, federal and international laws, be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiff, his heirs and assigns, and Plaintiff's protected class, their heirs and assigns.

9.10. That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.

## X. COUNT TWO

10.1 That, in light of precedential government use of RICO laws against Atlanta teachers for changing test answers, that this court likewise liberally construe RICO laws and thereby find guilty all Defendants who have associated with a RICO enterprise of persons and other

individuals who were associated in fact, all of whom did engage in, and whose activities did result in illegal monetary gains in violation of RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

10.2. That this court likewise thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) *supra*.

10.3 That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

10.4. That all Defendants and all of their directors, officers, employees, agents, servants, house slaves and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

10.5. That all Defendants and all of their directors, officers, employees, agents, servants and all of their directors, officers, employees, agents, servants, house slaves and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT TWO *supra*.

10-6. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violations of applicable state, federal and international laws.

10.7. That judgement be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to violations of 18 U.S.C. 1962(c) *supra*.

10.8. That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962 *supra*.

10.9. That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*.

10.10 That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a mimimum of $160.00 per hour worked (Plaintiff's standard professional rate at start of this action).

10.11. That all damages caused by Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violations of applicable state, federal and international laws, be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiff, his heirs and assigns, and for the benefit of Plaintiff's protected class, their heirs and assigns.

10.12. That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned this legal action.

# XI. COUNT THREE

11.1  That this court likewise liberally construe RICO laws and thereby find guilty all Defendants who have conspired to acquire and maintain and interest in, and/or conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. 1961(5), 1962(b) and (d) *supra*.

11.2.  That this court likewise thereby find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

11.3  That all Defendants and all of their directors, officers, employees, agents, servants, house slaves and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO enterprise that engages in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

11.4.  That all Defendants and all of their directors, officers, employees, agents, servants, house slaves and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

11.5.  That all Defendants and all of their directors, officers, employees, agents, servants and all of their directors, officers, employees, agents, servants, house slaves and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT THREE *supra*.

11.6. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violations of applicable state, federal and international laws.

11.7. That judgement be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to violations of 18 U.S.C. 1962(c) *supra*.

11.8. That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962 *supra*.

11.9. That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*.

11.10. That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a mimimum of $160.00 per hour worked (Plaintiff's standard professional rate at start of this action).

11.11. That all damages caused by Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violations of applicable state, federal and international laws, be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiff, his heirs and assigns, and for the benefit of Plaintiff's protected class, their heirs and assigns.

11.12. That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

CIVIL ACTION

# XII. SUMMARY OF DAMAGES

Summary of Reasonable attorney fees. TBA.

12.1. The damage matrix is three dimensional: for each Defendant, there are actual, consequential and punitive damages (3 columns) on each of the three counts (3 rows).

# XIII. JURY DEMAND

13.1 Plaintiff hereby demands trial by jury on all issues triable to a jury lawfully convened.

# XIV. PRAYER FOR RELIEF

**WHEREFORE, PLAINTIFF** prays for judgement against the Defendants as follows:

14.1. For general personal damages, twenty-five million dollars ($25,000,000) including pain and suffering together with special damages for Plaintiff's reasonable and necessary legal expenses, and medical expenses both past and future, the exact amount of which will be established at the time of trial;

14.2 For general damages to Plaintiff's protected class, ten billion dollars ($10,000,000,000) in partial payment for loss of life, limb, opportunity, health and wellbeing incurred over the last twenty-three (23) years as a result of Defendants' continuous ongoing pattern of racketeering activities;

14.3. For punitive damages in an amount to be proven at trial pursuant to Federal, State and International law:

14.4. For actual attorney's fees and litigation costs, pursuant to 42 U.S.C. 1988;

14.5. For statutory attorney's fees and costs;

CIVIL ACTION

14.6. For court supervised training and regulations requiring that the involved agencies and officers properly train their employees/officers on proper procedures for administrative action, proper administrative hearing procedures, respect for the Constitutional Rights of the public and interaction with public, and institute proper investigative and disciplinary procedures.

14.7. An order directing Defendants' to return Plaintiff's property located at 2300 S. Massachusetts Street, Seattle, WA 98144, as well as all Plaintiff's moveable property they have stolen therefrom within the past twenty-three (23) years.

14.8. For such other and further relief as the Court deems just and proper.

DATED this _16th_ day of _April 2021_

**Respectfully Submitted,**

*Omari Tahir-Garrett aka James C. Garrett*

**Omari Tahir-Garrett**
**Private Attorney General**

**VERIFICATION**

I, Omari Tahir-Garrett, am a Plaintiff in the above-entitled action. I have read and authored the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Seattle, Washington.

DATED this _16th_ day of _April 2021_.

**Respectfully Submitted,**

*Omari Tahir-Garrett aka James C. Garrett*

CIVIL ACTION

Omari Tahir-Garrett
Private Attorney General

CIVIL ACTION

EXHIBIT

ONE



After Recording Return to:

John J. Richmond, Property Manager
Seattle School District
4141 Fourth Avenue South, AP-310
Seattle, Washington 98134

Grantor:          Seattle School District No. 1, of King
                  County, Washington

Grantee:          African American Heritage Museum & Cultural
                  Center, a Washington non-profit corporation

Legal Description: Lots 1-3, Blk 2, Atlantic Heights, Vol 20,
                   pg 28 and Portion of Tract 17, Seattle
                   Homestead Association Five Acre Tracts

(additional legal description on page 5)

Tax Parcel Number:   092404-9010-06

Reference Number:    None

### REAL ESTATE CONTRACT

This Real Estate Contract (the "Contract") is entered into
this _____ day of January, 1998 by and between Seattle School
District No. 1, King County, Washington ("Seller"), and the
African American Heritage Museum & Cultural Center, a
Washington non-profit corporation ("Purchaser").

#### Recitals

A.    Seller owns certain real property located in King
County, Washington which is commonly known as the Colman
School. The property is more particularly described in
Paragraph 1 of the General Terms attached hereto and is
referred to as the "Property" in this Contract.

B.    In 1989, Seller and the State of Washington
Department of Transportation entered into an Agreement
Regarding Colman School Replacement (Agreement GC 8704, Federal
Aid No. 1-90-1) (the "State DOT Agreement") pursuant to which
Seller agreed not to use the Property for school purposes. A
copy of the State DOT Agreement is attached hereto as Exhibit
B.

C.    Seller has not occupied or used the Property since
1985. Since then, the building situated on the Property has

Y:\WPDAC\ASSD\STR\REK
1/16/98

1

been vandalized and deteriorated to an uninhabitable and unsafe condition. Several hazardous substances are also present in the building including, without limitation, lead based paint, asbestos and disease bearing material which must be properly removed or contained before the building can be used or occupied for any purpose. In its present condition, the building has no value. In addition, soil samples taken at the Property confirm the existence of lead based paint and certain petroleum products in the Land.

D. Notwithstanding the dilapidated condition of the building and the contamination of the Land, the Purchaser desires to purchase the Property for the purpose of developing and operating an African American Heritage Museum and Cultural Center and, in connection therewith, has agreed to pay for the removal or proper containment of the asbestos, lead based paint, disease bearing materials and any other hazardous materials discovered in the building. The Seller's policy is to sell surplus property by private sale to buyers which intend to use surplus property for special purposes provided such buyer pays fair market value and the sale otherwise complies with all laws, rules and regulations applicable to Seller. Purchaser has agreed to purchase the Property in accordance with those conditions.

E. To ascertain the fair market value of the Property, Seller obtained three MAI appraisals. After reviewing each appraisal, Seller determined the fair market value of the Property to be $325,000. Purchaser has agreed to purchase the Property for $329,000 provided Seller agrees to accept the Purchase Price in six (6) installment payments over a three year term with interest accruing on the unpaid principal balance of the Purchase Price at a market interest rate. Seller is willing to agree to that request upon the specific and general terms and conditions set forth below.

## I. SPECIFIC TERMS

| | |
|---|---|
| Effective Date: | January ____, 1998 |
| Seller: | SEATTLE SCHOOL DISTRICT NO. 1 of King County, Washington |
| Seller's Address: | 4141 Fourth Avenue South, AF-310 Seattle, Washington 98134 Attn.: John J. Richmond |
| Purchaser: | AFRICAN AMERICAN HERITAGE MUSEUM & CULTURAL CENTER, a non-profit corporation |
| Purchaser's Address: | 1515 24th Avenue South Seattle, Washington |
| Form of Deed: | Fulfillment Deed |
| Title Exceptions: | General and Special Taxes and Assessments not yet due and payable and other Permitted Exceptions as described in General Terms |
| Down Payment: | $ 49,350 U.S. |
| Balance Due: | $279,650 U.S. |
| TOTAL PURCHASE PRICE: | $329,000 U.S. |

PAYMENT TERMS:

| | |
|---|---|
| Interest Rate: | 7.5% percent per annum. |
| Installment Periods: | Semiannual payments |
| First Installment Date: | July ___, 1998 |
| Installment Amounts: | $52,913.19 U.S. |
| Final Payment Date: | January ___, 2000 |
| Default Rate: | 11.5% per annum |
| Late Charge: | 5% of delinquent installment payments |
| Prepayment Provisions: | Prepayment in whole or in part allowed without penalty |

Portion of Purchase Price
Allocated to Real Property:     $329,000 U.S.

Is the Property used principally for agricultural or farming
purposes?      /__/  Yes     /XX/  No

Miscellaneous:            Exhibit A (Legal Description)
                         Exhibit B (Form of Fulfillment Deed)
                         Exhibit C (Insurance Requirements)
                         Exhibit D (List of Property Reports)
                         Exhibit E (State DOT Agreement)
                         Exhibit F (Declaration of Use
                              Restriction)

THE SELLER AND THE PURCHASER HEREBY AGREE TO THE TERMS
HEREINABOVE SET FORTH AND THE COVENANTS AND CONDITIONS
CONTAINED IN THE ATTACHED GENERAL TERMS, ALL OF WHICH ARE
INCORPORATED BY THIS REFERENCE.  IN THE EVENT OF ANY CONFLICT
OR INCONSISTENCY BETWEEN THE SPECIFIC TERMS (INCLUDING ANY
EXHIBITS ATTACHED) AND THE GENERAL TERMS, THE FORMER SHALL
CONTROL.

IN WITNESS WHEREOF, the Seller and the Purchaser have executed
this Contract as of the date first above stated.

        Seller:                    SEATTLE SCHOOL DISTRICT
                                   NUMBER 1, of King County,
                                   Washington

                                   Its:

        Purchaser:                 AFRICAN AMERICAN HERITAGE
                                   MUSEUM & CULTURAL CENTER, a
                                   Washington non-profit
                                   corporation

                                   Its:

STATE OF WASHINGTON }
                    } ss.
COUNTY OF KING }

On this 16ᵗʰ day of JANUARY , 19 98,
before me, the undersigned, a Notary Public in and for the
State of Washington, duly commissioned and sworn, personally
appeared JOHN STANFORD to me known to be the
SUPERINTENDENT OF SEATTLE SCHOOL DISTRICT
NO. 1 OF KING COUNTY, WASHINGTON, the entity that executed the
foregoing, and acknowledged the said instrument to be the free
and voluntary act and deed of said entity, for the uses and
purposes therein mentioned, and on oath stated that he is
authorized to execute the said instrument.

WITNESS my hand and seal hereto affixed the day and year
in this certificate above written.



_____
ELIZA C. ALLEN
(Printed Name)
NOTARY PUBLIC in and for the State of
Washington, residing in SEATTLE
My appointment expires
4-9-00

STATE OF WASHINGTON }
                    } ss.
COUNTY OF King }

On this 16ᵗʰ day of January , 19 98,
before me, the undersigned, a Notary Public in and for the
State of Washington, duly commissioned and sworn, personally
appeared Charles Porter to me known to be the
Chairman of the AFRICAN AMERICAN
HERITAGE MUSEUM & CULTURAL CENTER, the non-profit corporation
that executed the foregoing, and acknowledged the said
instrument to be the free and voluntary act and deed of said
non-profit corporation, for the uses and purposes therein
mentioned, and on oath stated that he is authorized to execute
the said instrument.

WITNESS my hand and seal the day and year in this
certificate above written.

_____
Carol J. Johnson
(Printed Name)
NOTARY PUBLIC in and for the State of
Washington, residing in Blue
My appointment expires 10-27-99

EXHIBIT
TWO
(2)

# AGENT REPORT
### (AR 381-130; FM 30-17)

| 1. NAME OF SUBJECT OR TITLE OF INCIDENT | 2. DATE SUBMITTED |
|---|---|
| GARRETT, James Cordell (OMARI)<br>Pvt E1, US 56 960 104<br>DPOB: 4 May 1946; Seattle, Washington | 5USC 552 (b)(7)(D)<br>5USC 552a (k) (2) & (5)<br>26 November 1968 |

3. CONTROL SYMBOL OR FILE NUMBER

8297-6007    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

4. REPORT OF FINDINGS

STATEMENT BY FBI AGENT CARVER GATTON. SUBJECTS
HISTORY TEACHER FOOTBALL COACH GARFIELD HIGH SEATTLE
CHARACTER REFERENCE) On 18 November 1968,

_____ was interviewed concerning James
Cordell GARRETT _____ who had known SUBJECT
_____ stated substantially as follows:

_____ first met SUBJECT in _____
_____ Source had _____ contact
WITH HIM _____

SUBJECT had played both football and baseball at Garfield High
School and had been a very good competitor. In football, HE played quarter-
back and did a good job of leading the team. After graduating from Garfield
High School, HE attended Shoreline Community College. HE seemed to be from
a good family, and was a good student.

Though HE never had any problems in associating with team members
or fellow students, HE seemed to be a loner and an individual thinker. HE
gave the impression of not communicating HIS true thoughts and seemed to
have some thoughts of deep annoyance. Source could not illustrate this
aspect of HIS character by any specific actions or comments of SUBJECT,
but felt that this problem of SUBJECT'S, if it were one of a feeling of
racial prejudice, could lead to HIS involvement in militant racial groups
which were non-existent at the time Source knew HIM. At one time, HE quit
the baseball team when HE felt that certain discipline for the team was a
matter of prejudice. HE also had threatened to quit when another individual
was chosen over HIM for the reception of an athletic award. If HE was deter-
mined to perform a job, HE would serve very creditably; however, if HE did
not feel personally committed to the activity, Source would have reservations
about HIS performance.

SUBJECT always conducted HIMSELF in a well behaved manner and never
required any disciplinary action by the school. Source had no reason to
question HIS integrity, discretion, or moral standards. SUBJECT was not
known to have ever been arrested, to drink excessively, or to use drugs.
SUBJECT was not known to have ever belonged to any racial or radical
political organizations. SUBJECT was not known to advocate or support
any groups or ideologies whose goals were inimical to the best interests
of the United States. HE was not known to have ever been involved in any
demonstrations by such radical groups.

68

THIS PROTECTIVE MARKING IS
EXCLUDED FROM AUTOMATIC
TERMINATION

| 5. TYPED NAME AND ORGANIZATION OF SPECIAL AGENT | 6. SIGNATURE OF SPECIAL AGENT |
|---|---|
| ROBERT J. CONKLIN, 115 MI GP (CI) (IIISEA) | _(signature)_ |

DA FORM 341
1 APR 52    REPLACES WD AGO FORM 341, 1 APR 47, WHICH IS OBSOLETE

| 1. NAME OF SUBJECT OR TITLE OF INCIDENT | 2. DATE SUBMITTED |
|---|---|
| GARRETT, James Cordell  DSC 552 (b)(7)(D) | 26 November 1968 |
| Pvt E1, US 56 960 104  5 DSC 552a (k)(2)(5) | 3. CONTROL SYMBOL OR FILE NUMBER |
| DPOB: 4 May 1946; Seattle, Washington | |
| | 8297-6007  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 |

4. REPORT OF FINDINGS

Because of the above expressed uncertainty about HIS character and commitments, and the possibility that these traits might become manifested in militant political activity, Source would question HIS loyalty.

███████ felt that he could not recommend that James Cordell GARRETT be favorably considered for assignment to a position of trust and responsibility with the United States Army because of Source's feelings of HIS deep mental reservations and the possible unexpressed attitude of racial discrimination.

10/4/94

---

## Tide of guns flowing from Russia to U.S.

Reuters

WASHINGTON—A potential billion-dollar tide of guns and ammunition flowing from Russia to the United States is raising worries at the State Department and officials want all import licenses for such arms denied.

State Department spokesman Mike McCurry said yesterday that 250 U.S. firms have asked for permission to import 796 million rifles and pistols and more than 7 billion rounds of ammunition from Russia and other countries in the former Soviet Union this year.

"This is a huge increase in the volume of license applications that we've seen," McCurry said at a briefing, noting that only 1,000 weapons were imported from the former Soviet Union in 1992 and only 18,000 in 1993.

McCurry said his department was recommending that the Treasury Department deny approval to firms seeking to bring the guns into the United States until studies are done to see what is spurring such a massive increase.

---

69

THIS PROTECTIVE MARKING IS
EXCLUDED FROM AUTOMATIC
TERMINATION

| 5. TYPED NAME AND ORGANIZATION OF SPECIAL AGENT | 6. SIGNATURE OF SPECIAL AGENT |
|---|---|
| ROBERT J. CONKLIN, 115 MI GP (CI) (IISA) | *Robert J. Conklin* |

DA FORM 341
1 APR 52
REPLACES WD AGO FORM

EXHIBIT
THREE

(3)

# Final Report

# MAYOR'S
# AFRICAN AMERICAN
# HERITAGE MUSEUM
# AND CULTURAL CENTER
# COMMITTEE

February 1994

February 1994

# MAYOR'S AFRICAN AMERICAN HERITAGE MUSEUM AND CULTURAL CENTER COMMITTEE

Norman B. Rice, Mayor

John Cannon, Chair

**COMMITTEE MEMBERS**
Vivian Caver, Earl Debnam, Leroy Drake, Patricia Dunston, Robert Flowers, Dr. Robert Gary, Patricia Gayton, Marella Griffin, Michael Hatmaker, David Hsiao, Charlie James, Herman McKinney, Danny Piecora, Jay Reich, Michael Ross, Dr. Millie Russell, Dr. Spencer Shaw, Carissa Smith-Hunt, Omari Tahir, T.J. Vassar, Perry Wilkens

**CITY OF SEATTLE**
Andrew Lofton, Jim Diers, Denice Johnson Hunt, Allynn Ruth, Karen Tsao

**SEATTLE SCHOOL DISTRICT**
John Richmond

**SPECIAL THANKS TO**
Eze Anamelechi, Daniel Bretzske, Denby Barnett, Rhonda Gossett, Gregory Hill, Clem Huguley, Laetitia Johnson, Antoine Marshall, Charles Payton, Akili Secka, Streeter/ Dermanis Associates, the Citizen's Support Committee and countless others who provided enlightenment and expertise.

**PREPARED BY**
Denice Johnson Hunt, Karen Tsao

Graphics: Claudia Denney

# Contents

Rationale ———————————————————————— 1

Executive Summary ——————————————————— 4

   I.   Mission ——————————————————————— 7

   II.  Program Outline ———————————————— 8

   III.  Governance ————————————————— 11

   IV.  Facilities ——————————————————— 15

   V.  Fund-raising Plan ——————————————— 17

   VI.  Renovation Approach, Workplan and Schedule ——— 20

Conclusion ———————————————————————— 23

Appendix -- Summary of Assessment of Colman School for Reuse

Floor Plans of the African American Heritage Museum at Colman School



# Rationale

"I know that I am asking the impossible. But in our time, as in every time, the impossible is the least that one can demand - and one is, after all, emboldened by the spectacle of human history in general, and American Negro history in particular, for it testifies to nothing less than the perpetual achievement of the impossible."

**James Baldwin,**
*The Fire Next Time* (1963)



*"Soul Pole," depicting "400 years of the Black in America," at the Douglass-Truth Library. (Don Munford)*

There are times in history when ordinary men and women set out to achieve seemingly impossible goals. The effort to establish an African American Museum is one such instance in Seattle's history. This quest can be traced to the summer of 1983 when 400 Central Area residents petitioned then Mayor Royer to create a heritage center to honor and preserve African American culture. In 1985, in perhaps the most potent symbol of the African American community's determination to create such a museum, the old Colman School was occupied. The longest occupation of a public building in America has ended, and the dream of an African American Museum is stronger than ever. This report reaffirms that seemingly impossible dream, and in itself, represents an important milestone in the realization of that dream.

The Mayor's committee welcomes this opportunity to explain and share this dream of the African American community. We welcome the public scrutiny that such an achievement will demand. We begin with the central question: Why do we need an African American Museum in Seattle?

> *Having an African American Museum and Cultural Center would increase the awareness of and appreciation for the contributions of African Americans to American life, history, and culture, particularly as it relates to the Pacific Northwest.*

There are no major repositories of African American culture in Washington, despite the magnitude of the contributions of African Americans to the development of our state and region. For the most part African Americans remain largely invisible on the historical landscape of this state. Much of the historical record that presently exists, in the form of artifacts and memory, will vanish because it is not properly collected and stored. Seattle is home to the largest number of African Americans in Washington, and it is here that African Americans have made, and continue to make, many of their most notable contributions. This region was built and has flourished because of the creativity and industry of many peoples. The contributions of African Americans are as significant as those of any ethnic group, and yet they are not readily accessible to the people who live here.

> *It is important to preserve that history and culture as a reservoir of support for African Americans of all ages in our community today.*

2

We live in a time of grave threat to the African American community. A whole generation of African Americans are in danger of losing their way, and often their lives, to drugs, gang warfare, and despair. This threat is more serious now than at any time in our history. To paraphrase the writer Cornell West, "the genius of our black foremothers and forefathers was to equip us with cultural armor to beat back the demons of hopelessness, meaninglessness, and lovelessness." This museum can be an embodiment of that cultural armor. It will be a place where the African American tradition of creating, building, and thriving in the unusually harsh conditions of America are readily accessible to inform, to educate, to nurture, to inspire, and to provide positive alternatives for our young people.

## *This museum is not only for African Americans, it is for all Americans.*

Many American art forms and artifacts that are African American in origin, have broad acceptance in American culture, and have a role in the education and cultural appreciation of all peoples. In addition, the experience and achievement of Black America is one that provides lessons for the human experience worldwide. The international appeal of that achievement was evident two years ago when Americans watched student protesters in China singing "We shall overcome."

This facility can help to heal many of the racial wounds of America. The Los Angeles riots highlighted the separateness between Black and White America which continues 30 years after the civil rights struggle. We know that what is good for Black America continues to be good for all America. Ours is a common destiny, which can end in despair and confusion or in hope and celebration. That the people of this City and region share in that hope is evidenced by the election of an African American mayor. This museum can be a place where any American can appreciate the remarkable achievements of African Americans and celebrate the promise of America as an ethnically diverse experiment in democracy.

## *Finally, because we can do it.*

After many years of talking and negotiating, we have a proposal, and just as importantly, the people, the support, and the commitment to build an African American Heritage Museum and Cultural Center. We are committed to the concept that this be a private rather than a City facility, although we will need a strong commitment from all branches of government, including the City, to raise the capital to construct this museum. In the years to come we will have to reach out to the African American community and to the broader community for additional support. The task is enormous but certainly not impossible, given the distance that we have already traveled.

# Executive Summary

## Overview

The Mayor's African American Museum Committee has been charged with developing a plan for an African American Museum and Cultural Heritage Center in the old Colman School building. Establishing this facility has been a community dream for more than a decade. In undertaking this task, the committee has looked at other museums in the Seattle area and throughout the country, and we have had serious discussions with leaders of many communities. We are convinced that this community can successfully build and operate such a facility. Moreover, we feel we can be part of a core group that galvanizes the larger community toward this goal. Since the committee was given its charge in March of 1993, a number of small but significant goals have been achieved. Our achievements include:

- ☐ Agreement on the mission for the new museum.

- ☐ Development of a Governance concept for the new museum.

- ☐ A $3,000 Small and Simple Matching Fund Award for creative signage and cleanup of the old Colman School.

- ☐ A $65,000 Neighborhood Matching Fund Award to limit deterioration to the old Colman School building. In developing this application for the large grant, the committee has secured over $100,000 in pledged contributions.

Although much has been done to date, the committee recognizes that much more remains to be done. The factors involved in acquiring and renovating the old Colman School are daunting even for a long established organization. The committee also recognizes that the success of this museum effort will require a strong organization with broad support throughout the community. Consequently, the committee's focus for the upcoming year is to build the organization, while simultaneously refining program elements and securing financial commitments from government agencies and the broader community. For these reasons, the community in its desire for an African American museum will have to rely on a strong partnership with the City of Seattle, other local governments, and the corporate community at the outset. The elements critical to making this museum succeed are a strong commitment from both the City and this committee and its successor group.

These circumstances and the massive investment to renovate the Colman School leads this committee to recommend the use of a Public Development Authority (PDA) to address issues of building transfer, design, and development; and the establishment of a nonprofit museum corporation to focus on program elements and conduct the day-to-day business of operating a museum.

Although this represents a significant commitment from the City, the committee will also make a major commitment to the project. The committee agrees to re-configure itself for its changing mission and to use a 501(C)(3) non-profit corporation to begin program development, to establish a fund raising effort, and to build a professional organization that will operate the museum. Moreover, the committee agrees to provide a stable and reliable governance system for the museum through the establishment of a Museum Board and the election of responsible officers. To demonstrate our commitment to this venture, the committee has undertaken to raise $200,000 to develop a list of 2,500 contributors/ supporters, to encourage the City to use a PDA.

Because of the magnitude of the task at hand, the committee requests the City's endorsement of a committee proposal to seek a loaned executive from a local corporation to spearhead its initiative for 1994. This is a full-time job.

This report, is but one step in a continuing process, provides greater detail on the committee's development concept. It is organized as follows:

I. Mission
II. Program Outline
III. Governance
IV. Facilitites
V. Fund-raising Plan
VI. Renovation Approach, Workplan and Schedule
VII. Conclusion



# 1. Mission

In 1994 the Museum Board will work with the community to develop and refine the exact activities to be housed in the old Colman School. These activities take into account the diversity of African Americans history and of creative expression. In order to prosper the museum must constantly respond to changing community directives. The mission statement must therefore be broad enough to encompass those changing needs. This committee believes that the new facility should be called "Heritage Museum and Cultural Center" and adopted the following mission statement:

## Mission Statement
## African American Heritage Museum and Cultural Center

The African American Heritage Museum and Cultural Center exists to promote and preserve the history, culture, traditions, and achievements of African Americans and will serve as a focal point for African Americans of all generations as well as for the broader community to celebrate and to share an appreciation and reverence for the African diaspora, through exhibits, tours, research, educational programs, performances, and various cultural activities.

The committee adopted the following goals to assist the museum in achieving its mission:

**Goal 1:** Establish a community based facility to promote the history, culture, traditions and achievements of African Americans.

**Goal 2:** Acquire the former educational building, the Colman School, for use as a museum and cultural center.

**Goal 3:** Provide and promote educational programs in the arts and heritage disciplines.

**Goal 4:** Provide positive learning alternatives for youth.

**Goal 5:** Adopt and execute strategies for the operation of the museum and cultural heritage center, based a sound planning process, research, and communication.

# II. Program Outline

Although the major program issues will be addressed in the upcoming year, it is essential to clearly articulate the principles for program development. These principles will enable us to devise a practical outline to guide the future development of programs and provide a framework for space planning within the facility.

The museum will serve the Seattle-King County region, school districts, domestic and international visitors, and other ethnic and historical groups. While the museum's focus should be intergenerational, programs for the education and enrichment of young people are of paramount importance and should be an integral part of all program centers. It is anticipated that the museum will work with the Seattle School District and other educational organizations to develop enrichment programs on African American arts history and culture for school age children from kindergarten through grade 12.

Criteria for deciding what program elements should be pursued include:

- Limit the duplication of existing community programs; instead the museum should develop a strong network to enhance existing programs in the surrounding community.

- Develop a strong historical focus.

- Develop a strong educational focus.

- Encourage shared learning.

- Capitalize on nearby public facilities e.g., Langston Hughes Center and Garfield Community Center, to avoid duplication.

- Working with the Pratt Fine Arts Center and the Cornish School of Fine Arts to develop an artist-in-residence program.

Potential functional centers within the Museum include:



- Archives or Northwest History
- Visual arts
- Music
- International Studies
- Conferencing
- Science & Technology
- Revenue centers including fashion and design

## Archives or Northwest History

The archives and Northwest History Center could preserve artifacts of African American pioneers and provide exhibits on the history of African Americans of note, trends or particular events in local African American history. The museum could work with the Museum of History and Industry and other heritage institutions to develop displays highlighting the role of African Americans in local history. Displays could move the viewer through time. The center could also archive African American art by such means as written histories, news clippings and story telling. Themes for permanent collections will be developed within the coming year.

## Visual Arts

The purpose of the visual arts center should be to depict African American history positively, honestly, and accurately in a permanent display. It should display all forms of art and the work of artists past and present. There should also be artifacts representing countries in Africa and the African diaspora, the migration from the south to the north in the United States, and the settlement of the Pacific Northwest.

Art shows could feature the work of a single artist or a group of artists, or focus on a theme. In conjunction with the Pratt Fine Arts Center, the museum might conduct art workshops for all age groups.

## Science and Technology

The Science and Technology topics should be incorporated within the other centers. For example, the physics of music could be included in the musical center, or the chemistry of paint in the visual arts center.

## Music

The concept for a musical center should be evaluated in light of the proposal of the Central Area Youth Association (CAYA) to set up a recording studio and music program at its new facility. The Museum musical center should be designed to enhance and complement the CAYA facility.

The purpose of the musical center is to depict African American history in music positively and to encourage development in all musical styles, performance and composition. It could portray African American contributions both locally and nationally and increase cultural awareness among the community.

The facilities could include:

☐ A small, intimate performing space that could also be used for workshops.

☐ Practice space in soundproof cubicles for individuals and groups.

☐ An instrument library for use within the center.

☐ A recording studio to produce recordings and to teach technical aspects.

☐ A visual display of the history of musical instruments.

Program activities could include performances and workshops by featured artists; classes in history of music, composition, and performance; and archives of African American music, recordings, sheet music, and news clippings.

Revenue centers are discussed in Section V, Fund-raising Plan, under operating income. As with other program areas, revenue centers should provide work and educational opportunities for youth in the community.



# III. Governance

## Future Role of this Committee

Mayor Rice charged this committee with making a recommendation on how the museum could be created. This report recommends the formation of both a nonprofit corporation and a public development corporation to carry out the museum's mission.



The transmittal of this report signals that we have been successful in broadening our existing nonprofit corporation to see the museum completed. Upon submittal of this report, the work of this committee will end. Most of us have volunteered to continue on by serving on the board of the nonprofit organization, others may serve on the board of the PDA, still others will choose to work on one of the many subcommittees needed to complete this project. Our recommendation for the governance of this museum follows.

## Recommendation

The committee fully understands that implementation of this proposal will require an accountable board capable of handling large sums of money, negotiating a complex construction contract, and managing the ongoing operations of the museum. The Board therefore must be composed of responsible individuals with appropriate credentials and credibility. The committee also understands that implementation of the project will require a broad base of support from many other ethnic, governmental, and philanthropic groups.

To achieve these multiple goals, the committee recommends the use of both a public corporation (PDA) and a nonprofit corporation as outlined below:

**Public Corporation.** The committee recommends that the Mayor establish an African American Cultural Heritage Center Authority pursuant to RCW 35.21.745 and ordinances of the City. This single purpose PDA would have the express purpose of:

☐ Accepting title to the old Colman School and other properties related to the museum's mission such as the landmark James W. Washington, Jr. house.

☐ Developing a lease and development agreement with the nonprofit corporation described elsewhere in this document.

☐ Developing a plan for the renovation of the property.

☐ Accepting public grants for improvements to the facility and accepting moneys collected by the nonprofit for the same purpose.

When the renovation is completed, the PDA may no longer be needed. On the other hand, it may remain as lessor if that arrangement is acceptable to the nonprofit, the PDA, and the City

PDA board members should have demonstrated experience in museum operations, finance, development, construction, community involvement, and business A majority of the Board should be African Americans. The Mayor would appoint all members of the PDA Board except that the nonprofit corporation would submit recommendations for up to one half of the Board members.

The major responsibilities of the PDA Board include:

☐ Negotiating a lease and development contract with the nonprofit corporation.

☐ Hiring a development director or project manager to direct and complete the facility.

☐ Hiring architects, engineers etc.

☐ Supervising construction contracts.

☐ Obtaining construction contracts, preparing Environmental Impact Statements or other permit documents.

☐ Making reports on the construction progress to the Mayor and the City Council and to the board of the nonprofit.

**Nonprofit Corporation.** The committee believes strongly that the development of the museum must emanate from the African American community and other interested groups in the larger community. In order to assure both the City and the African American community that community support is and will be an integral part of museum development and operations, the committee proposes that a Washington nonprofit corporation formed to develop the museum be expanded to develop museum programs, raise funds, and operate the museum.

The board of the nonprofit should consist of:

☐ The original community leaders who began this long and arduous struggle.

☐ Members of the Mayor's committee who want to continue their role as board members of the museum nonprofit.

☐ African American artists, historians, and celebrities of regional or national stature.

☐ Interested corporate donors and fund-raisers.

☐ Persons with demonstrated experience in museum development, finance, management, programming etc.

☐ Youths

72

The initial purpose of this nonprofit corporation would be to solicit broad-based public support for the museum. This will be done by selling annual organizational memberships (e.g., $15 per person or $25 per family). Most of the money raised would be held and contributed to the public corporation for capital costs related to the museum and the remainder would be used by the nonprofit corporation for administrative costs and to provide semi-annual newsletters informing members about the progress of museum development.

To institutionalize the linkage between the public corporation and the nonprofit, the committee recommends that the nonprofit corporation nominate citizens to sit on the board of the public corporation. Initially, the nonprofit corporation would act as a private auxiliary of the public corporation. The nonprofit corporation would be the tenant of the old Colman School; would contract with the public corporation to provide development services; and ultimately would become the museum's major fund-raising arm. While the role of the PDA may diminish upon the completion of construction, the nonprofit will remain the museum's operator, its fund-raising and management role will continue in perpetuity.

## Advantages of this Model

The committee recommends this two-pronged approach for several reasons.

1. First, use of a public corporation would provide immediate credibility for the project in the eyes of the larger community and to potential funding sources, both private and public. This credibility is derived from direct mayoral involvement and the City's ongoing oversight responsibilities.

2. The use of a public corporation will enhance the availability of public funds for the museum. We expect that in an era of scarce public resources, projects with local political ties and public oversight may have a competitive edge.

3. It is important that the museum be perceived as a truly public-oriented facility. Part of the museum's mission will be to teach our entire community about the richness of African American heritage. A nonprofit corporation underscores this important outreach and educational function and the importance of this facility to the public.

4. The nonprofit corporation could help increase enthusiasm for and participation in museum planning and fund raising and provide a critical linkage to the African American community.

13

# Challenge

The committee appreciates that the use of a public corporation represents a significant commitment of the Mayor and the City. The committee therefore invites the Mayor to challenge the proponents of the museum to demonstrate support for the museum as follows:

- The City will continue to work with the committee to further refine of the plans for the museum but will not move to use a public corporation until the nonprofit corporation has available $200,000 (net costs) to contribute to the public corporation towards the development of the museum and has at least 2,500 individual or family memberships.

- The nonprofit will also raise approximately $100,000 toward the first year of the PDA's operating expenses. This initial dollar amount and the list of members, will provide a basis for the public corporation to hire staff and proceed toward further development.

While this will require a tremendous amount of work by museum supporters; this achievement will demonstrate a level of commitment that can be welcomed and matched by the City. The committee requests that the City begin the process to obtain title to the building immediately. The title of the building would be transferred to the PDA upon its formation. During the period between the submission of this report and the formation of the PDA only stabilization improvements (e.g., roof repair, hazardous material removal) will be made to the building. Therefore in the event that the City, the School District and the nonprofit cannot agree on the formation of a PDA, the City will be in possession of a building that is in significantly improved condition and the parties can design a building transfer/development process that is preferable.



# IV. Facilities

## Background

In 1992, Streeter/Dermanis Associates conducted a structural assessment of the old Colman School. The consultants concluded that the 48,000 square foot school building can be totally renovated with the first two floors (34,000 s.f.) designed for re-use as a cultural center/museum at a cost that is less than the cost of a new building, provided the program for the new building is equal or greater than 34,000 square feet.
(See Addendum 1)

The consultant further recommended the retention of the building because of its strong physical presence, its handsome architecture, and its role as a symbol of community stability across generations. Further, the building has become an immediate symbol of community achievement in the face of adversity and has the potential to become a more potent symbol of reconciliation.

## Cost Estimates

Streeter/Dermanis prepared three design options for the reuse of the structure. The cost of these options range from $6.3 million to $7.2 million, depending on the design configuration (See addendum 1). These costs include building stabilization costs estimated at $1.9 million. Cost estimates for a new building range from $4.2 to $7.6 million, depending on the design configuration. However, a new building would preclude the potential for approximately 2,000 square feet of additional space within the old Colman School. In light of this information the Mayor's committee was directed to plan for the renovation of the old Colman School.

## Building Transfer

At this time the Seattle School District retains ownership of the old Colman School. The committee recommends that the School District transfer ownership of the building to the City immediately after the museum PDA has been established. The City will subsequently transfer ownership to the museum PDA. The School District as landlord should assume responsibility for the removal of asbestos and other hazardous materials from the building before the City accepts the building. The nonprofit will attempt, with the support of the City and the School District, to obtain an Environmental Justice Grant from the Bullitt Foundation for this work, on condition that



the nonprofit assumes no responsibility for the removal of hazardous materials from the building.

In the interim, the School District needs to approve the building renovations to be done under the auspices of the Neighborhood Matching Fund (NMF). The committee has proposed a series of activities to be funded by the Neighborhood Matching Fund which will allow the community to reclaim the structure. Access to the building by committee-organized work crews is a cornerstone of our facilities approach. Moreover, successfully completing these activities in the public eye will constitute a major public relations opportunity for the museum.

## Building Stabilization

The major building elements in need of attention are upgrade of the seismic system and roof, removal of hazardous materials, brick and terra cotta work, plumbing system, mechanical and electrical systems, elevator and handicap systems, and windows and doors. The Streeter/Dermanis Study estimated these "building stabilization items," at $1.9 million. An additional $200,000 was added for architectural/engineering fees. The committee's most immediate facility task has been identified as installing a new roof to limiting deterioration to interior spaces and brick and terra cotta surfaces. The committee additionally recommends the investments in the facility listed below once building control issues are resolved.

| Activity | Cost | Status |
|---|---|---|
| New Roof | $150,000 | $65,000 Funded NMF |
| Hazardous Material Removal | 200,000 | |
| New Shear Walls | 400,000 | |
| Brick Work | 100,000 | |
| Terra Cotta Work | 100,000 | |
| Windows & Doors | 250,000 | |
| Elevator | 100,000 | |
| Handicap Access Work | 170,000 | |
| Electrical | 90,000 | |
| Environmental Controls | 100,000 | |
| Site work | 100,000 | |
| Plumbing | 100,000 | |
| Permits & fees | 100,000 | |
| Arch/Engineering | 200,000 | |
| **TOTAL** | **$2,110,000** | |

# V. Fund-raising Plan

This section addresses potential sources for initial stabilization costs and the first two years of operating costs. A more detailed fund-raising plan that addresses the needs of later years will await the formation of a museum board. It is important to note that the funding sources listed here do not represent a financial commitment at this time. Rather they represent the committee's commitment to approach these sources with funding proposals.

## Sources for Stabilization Funds

| Funding Source | Amount | |
|---|---|---|
| Washington State Legislature | $ 500,000 | |
| King County Legislative Appropriation | 200,000 | |
| King County Capital Facilities Grant | 100,000 | |
| City of Seattle | 300,000 | |
| Seattle School District | 300,000 | |
| Neighborhood Matching Fund Grant | 65,000 | *Awarded |
| Pledged Community Match | 145,000 | |
| Private Contributions  (including foundations) | 500,000 | |
| **TOTAL** | **$2,110,000** | |



## Other Capitol Costs

Streeter/Dermanis Architects developed three preliminary design schemes for the proposed museum (see Appendix A). These require an additional $2-$6.3 million. In 1994 the nonprofit organization and the PDA will select and refine a design scheme for the museum. It is anticipated that the realization of this scheme will be the subject of a 5-10 year fund-raising plan that will be conducted while there are small scale programs and exhibits in the building. The costs of these schemes are summarized below:

| Minimal Intervention Scheme - Scheme 1 | |
|---|---|
| 34,000 square foot museum | $4,862,600  * |
| (+ 14,000 s.f. space opportunity) | |
| 30% soft costs | 1,458,780 |
| **TOTAL** | **$6,321,380** |

**New South Entrance/New Auditorium - Scheme 2**

| | |
|---|---|
| 38,000 square foot museum | $5,614,600 * |
| (+ 14,000 s f space opportunity) | |
| 30% soft costs | 1,684,380 |

| TOTAL | $7,298,980 |
|---|---|

**Enhanced Lobby Scheme - Scheme 3**

| | |
|---|---|
| 34,000 square foot museum | $4,912,600 * |
| (+ 14,000 s.f. space opportunity) | |
| 30% soft costs | 1,473,780 |

| TOTAL | $6,386,380 |
|---|---|

*\* Includes $1.9 million already expended for stabilization*

# Operating Costs/Potential Revenues

Due to the heavy reliance on volunteers, operating costs for the Wing Luke Asian Museum, the Nordic Heritage Museum, and the Phinney Neighborhood Center are estimated at $100,000 to $175,000 per annum. Operating expenses for the African American Museum are estimated at $100,000 for the first three years. Operating expenses will be significantly highewr once the museum is fully operational. These funds and the estimated $100,000 needed for the first year of PDA operations will be raised from private sources. Since staff salaries constitute 45% of operating costs, a corporate loaned executive for the first year would significantly reduce costs. Operating needs, estimated at $100,000, are proposed to be raised from private sources. As a rule, memberships and admission fees never completely meet the need for funds to operate museums. In order to limit fluctuations in revenue and to stabilize operations over the long term, the committee decided to examine a variety of revenue producing activities: These include development and leasing options for the additional 14,000 square feet of space not required for museum use.
In addition to the public uses for sharing the building cited elsewhere in this report, the program subcommittee evaluated other revenue producing activities to supplement ongoing operations. Given the additional space in the building, the following activities could provide additional income for the museum.

# International Center

The purpose of the International Center would be to provide a link between the African American community in Seattle with other communities. It would house displays from various countries, and could participate in a sister city program. It would contain a visitor center that would feature information about the African American community in the Pacific Northwest and local places important to its history. It would also provide travel information on related cities elsewhere. The museum could stage events at the International Center, and outside groups could rent the center for related events.

## Conference Center

A conference center is a possible use for the third floor of the old Colman School building
It would be available for use by the community and might contain workshops, classrooms,
and meeting rooms. Space rental fees from it would provide additional revenue to the
museum.

## Other Revenue

Other potential revenue generators might include:

- ☐ Chop bar food concession
- ☐ Gift Shop
- ☐ Catering service with contracts awarded to minority businesses
- ☐ Conference/lecture hall
- ☐ Research facilities
- ☐ Offices
- ☐ Commissions on art and craft sales
- ☐ Commissions on clothing sales and design items

The gift shop would offer for sale items on commission from local producers as well as
retail items. In addition, the cultural center could contract with the Seattle School District
to provide enrichment programs for school-age children similar to the current arrangement
between the Seattle School District and the Pacific Science Center. Annual operating
revenues for this program could be in the range of $100,000 per year. It is expected that
within five years from the opening of the museum, revenue generators can supply up to
30% of needed operations income.

# VI. Renovation Approach, Workplan and Schedule

The magnitude of the initial stabilization effort suggests that the committee must focus on the two lower floors (34,000 square feet) as recommended by the consultant report. This allows for joint funding for stabilization of the structure by one of a number of compatible potential co-users. The nonprofit can explore such co-location opportunities in 1994. These may include City facilities, which are eligible for City CIP funds and/or; programs dedicated to education/cultural enrichment of youth in the adjacent community which qualifies for Community Development Block Grant (CDBG) funding. Committee members have been contacted by other local organizations interested in sharing the building. The feasibility of such opportunities will be examined in 1994. The following workplan overleaf outlines the activities to be begun immediately in the first phase.



# 1994-95 Workplan Schedule *



| April | May | June | July | August | September | October | November | December | January | February | March | April |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First meeting of board | Mayor's approval | Refine program concept | Refine architectural concepts | Council approval of PDAs property transfer | Begin EIS/SUAC process | Secure State/County commitments | | Search for new Director begins | | Permits issued | New Director hired | |
| | Brief City Council of project. explain property issues | Develop PDA or alternative structure | Develop program concept | Develop architectural concepts | PDA property transfer | Prepare job criteria for museum director | NMF work completed | | | End EIS/SUAC | Major construction begins | |
| | Develop short range funding plan | Secure technical expertise | Develop contract between PDA and non-profit | Public workshops/ meetings | Prepare job criteria for museum director | | | | | Ongoing Grant Applications | | |
| | Public workshops/ meetings | Obtain grant for hazardous clean-up | NMF work begins | Public workshops/ meetings | Property transfer | Refine design concepts | Public workshops, meetings | Public workshops, meetings | | Submit permits | | |
| | Election of board and officers | Public workshops/ meetings | Public workshops/ meetings | Hazardous clean-up completed | Public workshops, meetings | | | | | | | |
| | Prepare grant for hazardous waste removal | 501(C)(3) | Begin negotiations for property transfer | Small and Simple work completed | | | | | | | | |
| | Begin membership drive | Begin permit applications for hazardous property transfer | Evaluate other co-locations | $200,000* challenge achieved | | | | | | | | |
| | | Council approval to proceed with property negotiations | NMF contract | Loaned exec. begins work | $100,000 challenge for PDA | | | | | | | |
| | | Request loaned executive for first year | | | | | | | | | | |

Refine program concept ------------------------------------------------>

Begin fundraising toward challenge ------------------------------------------>

Outreach to communities that neighbor facility to broaden constituency ----------->

Raise $1,000,000 in public funds --------------
raise an additional $400,000 - $600,000 (private) -----------

# VII. Conclusion

This report is submitted in a spirit of hope. We have addressed the practical issues of governance, property transfer, and fund-raising. In addition, we have addressed the cultural and artistic issues of community aspirations and appropriate programming for the facility. While many details will need to be refined in the months ahead, we believe that we have developed a proposal that the City can accept because of its fiscal responsiveness and because it is both reasonable and ambitious. Recognizing that enormous challenges lie ahead, we undertake this assignment with cautious optimism and a commitment to hard work in the months ahead.



# APPENDIX

# Summary of
# Assessment of Colman School
# for Reuse

## Introduction

The study done by Streeter/Dermanis and Associates Architects in 1992 was the fourth in a series related to the development of an African American Cultural Heritage Center in Seattle. The first study, done in 1987 by ERA, focused on program alternatives and community support for such a facility, and examined similar museums locally and nationwide. The second study in 1988, lead by Myriad Systems and Services, examined potential sites and the possibility of reuse of existing structures. It also provided information on potential attendance, a cost/revenue analysis, financing alternatives, and possible management structure. Four sites were identified:

- Martin Luther King Jr. Memorial Park site
- Colman Elementary School
- Lot 29-C at Yesler Street and 25th Avenue, adjacent to the Randolf Carter Center
- Langston Hughes Cultural Arts Center

In 1990, a third study by Stripling Associates included eight public meetings and a survey of the community to elicit consensus on the choice of site. The community preferred the Colman School site, though the survey did not ask whether preference was for a new building or a renovated one at that site. The community preference was for a site on a hill rather than one in a valley. The study also discussed the issues of selecting a board, fund raising, and by-laws.

The recent Streeter/Dermanis study found that the cost of renovating the entire 48,000 square-foot Colman School building and using the first two floors (34,000 square feet) for the Cultural Center would be less than the cost of constructing a new building 34,000 square feet or larger. The architects examined five schemes in terms of layout, use, cost, and advantages and disadvantages.

## Program Issues

The 1987 study found that of other African American museums the most successful ones functioned primarily as museums. By focusing on exhibits, the museums ensured funding from outside sources and developed a steady stream of visitors. Through the quality of the exhibits, they developed the name recognition necessary to survive. More recently, these museum-oriented facilities have been looking into the addition of performance and instructional activities, and the facilities to house them, in order to increase revenues and to expand their role in their communities.

The 1992 study found that the original layout of rooms in the Colman School building is well suited for conversion to a museum. The average classroom size of 900 square feet is equivalent to a small-to-medium sized gallery. The connections of rooms to halls and between classrooms allows visitors' paths to loop through spaces as is ideal for museums. However, the fixed size of the spaces limits the way in which exhibits can be displayed. The long, broad hallways present a challenge to design displays which can provide a continuous experience as the visitor moves through them.

In a new building, the potential for centralized organization allows one person to cover admissions and supervise the public spaces. Moreover, the exhibit area could be designed as one large, dividable space, which would accommodate all kinds of exhibits. It would also be possible to separate the performance and museum spaces, while allowing both to be adjacent to the entry hall which functions as a foyer, a display space, and an area for smaller functions.

**Design Alternatives**

Five alternatives were analyzed by Streeter/Dermanis. The first three design schemes use the renovated school building with three different levels of alteration and use. The last two are schemes for new construction of space comparable to 1) the largest in program of the first three (i.e., museum and new performance area) and 2) a program for only the museum space. The cost estimates were based on existing knowledge of the building and average costs. Factors that may arise later in the development process can increase the cost. In the case of renovation, other conditions may be discovered during construction that would require additional work. In the case of new construction, costs can increase due to delays in decision making, increases in program scope, and quality upgrades. Costs cited include design, construction, permit and project management fees. Streeter/Dermanis projected the cost estimates to 1994.

Basic Stabilization (for all schemes): Removal of hazardous materials, structural repair, new roof, and systems for future expansion without tenant improvements.
Area: 20,000 s.f. of useable space with 28,000 s.f. for future expansion.
Cost: $1.94 million

*Remodel Options*

Scheme One: Renovation of existing structure, minimal alteration the interior using existing configuration for exhibit areas, and a 200-seat performance space.
Area: 34,000 s.f. of museum with 14,000 s.f. for future expansion
Cost: $6.32 million

Scheme Two: Addition to existing structure of new south entrance, a new 400-seat auditorium, and expansion of east entry into a central lobby with concession area.
Area: 38,000 s.f. of museum with 14,000 s.f. for future expansion.
Cost: $7.30 million

Scheme Three: Same as Scheme One plus expansion of east entry into central lobby with concession area.
Area: 34,000 s.f. of museum with 14,000 s.f. for future expansion.
Cost: $6.39 million
*New Building Options*

Scheme Four: Removal of hazardous material and demolition of existing building. Construction of new two-story structure for exhibit and performance spaces.
Area: 37,000 s.f.
Cost: $7.67 million

Scheme Five: Removal of hazardous material and possible demolition of existing building. Construction of new two-story structure with emphasis on exhibit space, and potential for expansion.
Area: 20,000 s.f.
Cost: $4.26 million

## Site Development

The study did not include specific designs for the site. Site improvements could add another $250,000 to the cost. Currently, there is asphalt on the east side; the south side was dug up during the I-90 lid construction and remains bare dirt; on the west, the ground slopes away steeply down to 23rd Avenue South; and the north is scheduled to be landscaped as part of the I-90 lid restoration.

The site could be reached by foot, bicycle, transit or car. On-street parking could be developed on Massachusetts Street and 24th Avenue South, and on-site parking could go either on the existing paved area or a new lot. The site development needs to make the entrance to the Cultural Center obvious and inviting.

## Other Issues

Structural: The existing structure does not meet current requirements for seismic design. Structural remediation is needed to tie the walls, floors, and roof together so that the structure can resist seismic forces.

Hazardous Materials: Asbestos-containing materials were found on piping, ducts, tanks and boilers. The ground floor contains areas of significant hazard where asbestos-containing materials are exposed and damaged around the boiler. The attic also has hazardous areas where pipe insulation is exposed and damaged. Areas of lesser hazard are on other floors and the roof. In either renovation or demolition, the asbestos-containing materials must be contained and removed. Destructive investigation is needed to determine the extent of asbestos placement behind walls and under floors.

Mechanical: Asbestos removal normally takes out the pipe or duct as well as the insulation. This will eliminate much of the existing heating system. A new heating system will be needed or reuse of the building, preferably a room-specific one which would lower energy costs.

The fire sprinkler system does not meet current coverage requirements. Much of the existing system would be removed in the seismic remediation work.

Electrical: The current electrical system is not adequate to modern usage such as electrical heating and appliances, computers, security systems, fire alarms, and communications equipment. Museums and performance facilities require extra lighting capability. New electrical service and wiring throughout the building must be installed.




SITE MAPS
APRIL 6, 1991



GROUND FLOOR PLAN

APRIL 1, 1992

LEAST INTERVENTION · SCHEME ONE



SECOND FLOOR PLAN

APRIL 1 1991

LEAST INTERVENTION-SCHEME ONE

African American Heritage Museum at Coleman School



THIRD FLOOR PLAN (UNUSED)
APRIL 1 1992

LEAST INTERVENTION·SCHEME ONE

African American Heritage Museum at Coleman School



GROUND FLOOR PLAN

APRIL 1, 1992

SOUTH ENTRANCE / NEW AUDITORIUM - SCHEME TWO

African American Heritage Museum at Coleman School



SECOND FLOOR PLAN
APRIL 1, 1992

SOUTH ENTRANCE / NEW AUDITORIUM · SCHEME TWO

African American Heritage Museum at Coleman School



THIRD FLOOR PLAN (UNUSED)
APRIL 1, 1990

SOUTH ENTRANCE / NEW AUDITORIUM - SCHEME TWO

African American Heritage Museum at Coleman School



GROUND FLOOR PLAN
APRIL 1, 1991

ENHANCED ENTRY / LOBBY · SCHEME THREE



African American Heritage Museum at Coleman School

SECOND FLOOR PLAN
APRIL 1, 1992

ENHANCED ENTRY / LOBBY - SCHEME THREE



THIRD FLOOR PLAN (UNUSED)
APRIL 6 1992

ENHANCED ENTRY / LOBBY - SCHEME THREE

African American Heritage Museum at Coleman School



African American Heritage Museum at Coleman School

FLOOR PLANS
APRIL 8, 1992

NEW CONSTRUCTION



African American Heritage Museum at Coleman School

FLOOR PLANS
APRIL 8, 1992

NEW CONSTRUCTION



THIRD FLOOR PLAN (UNUSED)
APRIL 4 1991

ENHANCED ENTRY / LOBBY · SCHEME THREE

African American Heritage Museum at Coleman School



FLOOR PLANS
APRIL 6, 1992

NEW CONSTRUCTION

African American Heritage Museum at Colman School



THIRD FLOOR PLAN (UNUSED)
APRIL 1 1992

ENHANCED ENTRY / LOBBY · SCHEME THREE

African American Heritage Museum at Coleman School



African American Heritage Museum at Cabman School

FLOOR PLANS
APRIL 8, 1991

NEW CONSTRUCTION



THIRD FLOOR PLAN (UNUSED)
APRIL 1, 1991

ENHANCED ENTRY / LOBBY- SCHEME THREE

African American Heritage Museum at Coleman School

EXHIBIT

FOUR

(4)


Office of the Secretary of State
Corporations & Charities Division

Filed
Secretary of State
State of Washington
Date Filed: 04/01/2021
Effective Date: 04/01/2021
UBI #: 602 279 973

# Annual Report

## BUSINESS INFORMATION

Business Name:
**URBAN LEAGUE VILLAGE LLC**

UBI Number:
**602 279 973**

Business Type:
**WA LIMITED LIABILITY COMPANY**

Business Status:
**ACTIVE**

Principal Office Street Address:
**105 14TH AVE, SUITE 200, SEATTLE, WA, 98122-7308, UNITED STATES**

Principal Office Mailing Address:
**105 14TH AVE, SUITE 200, SEATTLE, WA, 98122-7308, UNITED STATES**

Expiration Date:
**03/31/2022**

Jurisdiction:
**UNITED STATES, WASHINGTON**

Formation/Registration Date:
**03/18/2003**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**PROPERTY MANAGEMENT**

## REGISTERED AGENT    RCW 23.95.410

| Registered Agent Name | Street Address | Mailing Address |
|---|---|---|
| UL VILLAGE LLC | 105 14TH AVE, SUITE 200, SEATTLE, WA, 98122-7308, UNITED STATES | |

## PRINCIPAL OFFICE

Phone:
**2064613792**

Email:
**MMERRIWEATHER@URBANLEAGUE.ORG**

Street Address:

---

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2021040100206142 - 1
Received Date: 04/01/2021
Amount Received: $60.00

105 14TH AVE, SUITE 200, SEATTLE, WA, 98122-7308, USA

Mailing Address:
105 14TH AVE, SUITE 200, SEATTLE, WA, 98122-7308, USA

## GOVERNORS

| Title | Type | Entity Name | First Name | Last Name |
|-------|------|-------------|------------|-----------|
| GOVERNOR | ENTITY | URBAN LEAGUE OF METROPOLITAN SEATTLE | | |

## NATURE OF BUSINESS

- PROPERTY MANAGEMENT

## EFFECTIVE DATE

Effective Date:
04/01/2021

## CONTROLLING INTEREST

1. Does your entity own real property such as land or buildings (including leasehold interests) in Washington?
NO
2. As of January 1, 2019, has there been a transfer of stock, other financial interest change, or an option agreement exercised that resulted in a transfer of at least 16? percent interest in the entity?
NO
  a. If "yes", has the transfer of stock, other financial interest change, or an option agreement exercised resulted in a transfer of controlling interest (50 percent or greater)?
NO
3. As of January 1, 2019, has an option agreement been executed allowing for the future purchase or acquisition of the entity?
NO

You must report a Controlling Interest Transfer Return **IF**: you answered "yes" to questions 1 **AND** 2a.

Failure to report a Controlling Interest Transfer is subject to penalty provisions of RCW 82.45.220.

For more information on **Controlling Interest**, visit www.dor.wa.gov/REET.

## RETURN ADDRESS FOR THIS FILING

Attention:
**MARC TAYLOR**
Email:
**MTAYLOR@URBANLEAGUE.ORG**
Address:
**105 14TH AVE STE 200, SEATTLE, WA, 98122-7308, USA**

## UPLOAD ADDITIONAL DOCUMENTS

Do you have additional documents to upload? **No**

## AUTHORIZED PERSON

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2021040100206142 - 1
Received Date: 04/01/2021
Amount Received: $60.00

☑ I am an authorized person.

Person Type:
**INDIVIDUAL**

First Name:
**MARC**

Last Name:
**TAYLOR**

Title:
**CFO**

☑ This document is hereby executed under penalty of law and is to the best of my knowledge, true and correct.

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 20210401002061142 - 1
Received Date: 04/01/2021
Amount Received: $60.00